MICHAEL J. HADDAD (State Bar No. 189114)
JULIA SHERWIN  (State Bar No. 189268)
HADDAD & SHERWIN
505 Seventeenth Street
Oakland, California  94612
Telephone: (510) 452-5500
Fax: (510) 452-5510

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARENE BEECHAM, Individually, and KARENA CRANKSON, Individually | No: 2:07 -CV-01115-JAM-EFB |
| Plaintiff, | Hon.  John A. Mendez |
| vs. | |
| CITY OF WEST SACRAMENTO, a public entity, POLICE OFFICER TIMOTHY TWARDOSZ, POLICE OFFICER GEOFFREY ALBERT, POLICE OFFICER STEVE GODDEN, POLICE OFFICER ED HENSLEY, and DOES 4 through 10, Jointly and Severally, | **PLAINTIFFS' TRIAL BRIEF** |
| Defendants. | |

**1. Defendants' Claims of Potential or Subjective Threats Cannot Justify Their Use of Force Against Each Plaintiff.**

In Robinson v. Solano County, 278 F.3d 1007 (9th Cir. 2002) (*en banc*), the Ninth Circuit held that pointing a gun at a person "can be a violation of the Fourth Amendment, especially where the individual poses no particular danger." 278 F.3d at 1014-1015.[1] The Robinson Court repeatedly referred to the gunpoint at issue there as a "use of force." 278 F. 3d at 1014. The Court further explained, "We agree with the Fifth Circuit that '[a] police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause physical injury, but he has certainly laid the building blocks for a section 1983 claim against him.'" 278 F.3d at 1015 –1016, quoting, Petta v. Rivera, 143 F.3d 895, 905 (5th Cir. 1998).

Thus, pointing a gun at a person is a use of force that must comply with the Fourth Amendment, under the factors described in the leading excessive force case, Graham v. Connor, 490 U.S. 386 (1989). Under the Fourth Amendment, police may only use such force as is objectively reasonable under the circumstances. 490 U.S. at 397. The "reasonableness inquiry is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. "In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001).[2]

---

[1] The Robinson Court provided qualified immunity to the officers because the law in 1995, when the incident happened, was not yet sufficiently clearly established. Robinson was decided in February 2002, more than four years before Defendant Twardosz and other West Sacramento police officers pointed their guns at Plaintiffs. This law was clearly established in June, 2006.

[2] Less intrusive alternatives to the force that was used must be considered as a part of the "totality of the circumstances." Smith v. City of Hemet, 394 F.3d at 701 (*en banc*). See also, Deorle, 272 F.3d at 1282; Chew v. Gates, 27 F.3d 1432, 1443 (1994); Cunningham v. Gates, 229 F.3d 1271, 1291 n. 23 (9th Cir. 2000).

"The essence of the Graham objective reasonableness analysis is that the *force* which was applied must be balanced against the *need* for that force: it is *the need for force* which is at the *heart* of the Graham factors." Headwaters Forest Defense v. County of Humboldt (Headwaters II), 276 F.3d 1125, 1130 (9th Cir. 2002) (emphasis in original).

Factors to consider include "the severity of the crime at issue, whether the suspect poses an ***immediate*** threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 398 (emphasis added). "The most important single element of the three specified factors" is "whether the suspect poses an immediate threat to the safety of the officers or others." Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005) (en banc). **However, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."** Deorle, 272 F.3d at 1281.

The Ninth Circuit has repeatedly concluded, "Thus, where there is no need for force, any force used is constitutionally unreasonable." Headwaters Forest Defense v. County of Humboldt (Headwaters I), 240 F.3d 1185, 1199 (9th Cir. 2000); Lolli v. County of Orange, 351 F.3d 410, 417 & n. 5 (9th Cir. 2003) ("Where there is no need for force, *any* force used is constitutionally unreasonable;" excessive force holding in Headwaters I remains good law)*;* P.B. v. Koch, 96 F.3d 1298, 1303-04 & n.4 (9th Cir. 1996) (force was excessive because there was no need for any force).

---

Consideration of the "totality of the circumstances" also requires officers to investigate or seek further information in some situations. Mendocino Envir. Center v. Mendocino Co., 192 F.3d 1283, 1293 n.16 (9th Cir. 1999) (Although officer may rely on information from fellow officers, "this in no way negates a police officer's duty to reasonably inquire or investigate these reported facts").

No: 2:07 -CV-01115-JAM-EFB: PLAINTIFFS' TRIAL BRIEF                                                   2

Potential threats cannot justify the use of force.  The Ninth Circuit has repeatedly explained that that even with the significant risks inherent in law enforcement work, police officers may not hold a person at gunpoint in the absence of any present threat:

> Although we are mindful that those who serve the public by taking on the dangerous job of enforcing the criminal laws are not required by the Fourth Amendment to take unreasonable risks, we also recognize that, by their choice of a profession, they have knowingly agreed to subject themselves to some physical jeopardy. That is inherent in the job of a law enforcement officer. In fact, it is the nature of a democratic society that all of us, especially the police, take some risks in the interest of preserving freedom. While we must not compel police officers to take unnecessary risks, total security is possible, if at all, only in a society that puts a much lesser premium on freedom than does ours. Therefore in determining whether a stop was lawful or unlawful, we must consider the risk to the police officers inherent in the situation, but we must also consider the liberty interests all Americans cherish - specifically the freedom from unreasonable searches and seizures guaranteed by the Fourth Amendment to our Constitution.
>
> **In this nation, all people have a right to be free from the terrifying and humiliating experience of being pulled from their cars at gunpoint, handcuffed**, or made to lie face down on the pavement when insufficient reason for such intrusive police conduct exists. The police may not employ such tactics *every time* they have an "articulable basis" for thinking that someone may be a suspect in a crime. The infringement on personal liberty resulting from so intrusive a type of investigatory stop is simply too great.

Washington v. Lambert, 98 F.3d 1181, 1187-1188 (9th Cir. 1996) (emphasis added).  The Washington Court also agreed with the Seventh Circuit, which in 1988 wrote:

> The significance of the pointed gun is that it makes the encounter far more frightening than if the officer's gun remains holstered, or even drawn but pointed down at his side; and certainly where the danger of the encounter to the officer, though potentially serious, is not clear and present, the deliberate pointing of a gun at the suspect is problematic. It would be a sad day for the people of the United States if police had carte blanche to point a gun at each and every person of whom they had an 'articulable suspicion' of engaging in criminal activity.

U.S. v. Serna-Barreto, 842 F.2d 965, 967 (7th Cir. 1988) (Posner, J.), cited in Washington, 98 F.3d 1188-1189.

### 2. Plaintiffs' Claims for Unlawful Strip Search Are Supported by Federal and State Law.

The en banc Ninth Circuit found that it was clearly established before 2003 that a search that exposes one's undergarments is a strip search, and cited with approval the definition in Cal. Penal Code § 4030.  Redding v. Safford Unified School District, 531 F.3d 1071, 1080 (9th Cir. 2008) (en banc).  "Strip search" is defined in Cal. Penal Code § 4030(c), as "a search which requires a person to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the underclothing, breasts, buttocks, or genitalia of such person."

Courts are uniform in recognizing the egregious violation of privacy that strip searches entail.  The intrusive nature of a strip search, even one conducted in a reasonable manner and "with all due courtesy" is beyond dispute and "cannot be overstated."  Craft v. County of San Bernardino, 468 F. Supp. 2d 1172, 1179 (C.D. Cal. 2006) (granting summary judgment in favor of plaintiff); Kennedy v. Los Angeles Police Department, 901 F.2d 702, 711 (9th Cir. 1989).

Even if a strip search is conducted in private, courteously and without touching the arrestee, this "does not negate the fact that a strip search is a significant intrusion on the person searched."  Kirpatrick v. City of Los Angeles, 803 F.2d 485, 489-490 (9th Cir. 1986); Way v. County of Ventura, 445 F.3d 1157, 1160-1161 (9th Cir. 2006).

In Giles v. Ackerman, 746 F.2d 614 (9th Cir. 1984), cert. den. 471 U.S. 1053 (1985), the strip search -- conducted in an appropriate place and "with all due courtesy" -- was a "frightening and humiliating" invasion of privacy.  746 F.2d at 617.  In Chapman v. Nichols, 989 F. 2d 393, 395-396 (10th Cir. 1993), the court stated:

> There can be no doubt that a strip search is an invasion of personal rights of the first magnitude.  It is axiomatic that a strip search represents a serious intrusion upon personal rights.  The experience of disrobing and exposing

> one's self for visual inspection by a stranger clothed with the authority of the state, in an enclosed room inside a jail, can only be seen as thoroughly degrading and frightening. Moreover, the imposition of such a search upon an individual detained for a lesser offense is quite likely to take that person by surprise, thereby exacerbating the terrifying quality of the event. (citations omitted).

See also, Thompson v. City of Los Angeles, 885 F.2d at 1446 (9th Cir. 1989)("The feeling of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute"); Mary Beth G. v. City of Chicago, 723 F.2d at 1272 (7th Cir. 1983)(strip searches described as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission"); Wilson v. Shelby County, 95 F. Supp. 2d 1258, 1264 (N.D. Ala. 2000)("there is no greater expectation of privacy than that associated with our bodies; far more than any other expectation of privacy in a free society, we expect to avoid being required to strip naked, squat, spread our buttocks apart, and cough. At the very least, to intrude upon that privacy there must be some reason to do so." Id. at 1266).

  **A.** **Under the Fourth Amendment, a strip search in public is only lawful when done on a person under lawful arrest, with probable cause to believe the person is hiding dangerous contraband in the private area being searched, with exigent circumstances, and with privacy for the person searched.**

  Even a limited search of a person is a substantial invasion of privacy. The more intrusive a search, the more justification for the search must come. Terry v. Ohio, 392 U.S. 1, 18 n. 15, 24-25 (1967). The United States Supreme Court set forth the standard for determining whether a particular search is unreasonable in violation of the Fourth Amendment in Bell v. Wolfish, 441 U.S. 520 (1979).

  The justification in Bell for conducting any strip searches at all was for the protection of *institutional security* against the smuggling of contraband into a detention facility: "A detention facility is a unique place fraught with serious security dangers. Smuggling of

money, drugs, weapons, and other contraband is all too common an occurrence.  And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, App. 71-76, and in other cases." 441 U.S. at 559 (citations omitted).

In Bell, the Supreme Court held that visual body-cavity searches could, *in some circumstances* to protect institutional security, be conducted on less than probable cause, and set forth the test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  It requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

441. U.S. at 559, 560.

As will be discussed below, cases that have engaged in the balancing test mandated by Bell have routinely required that strip searches in correctional facilities be conducted only on individualized, reasonable suspicion that a person is concealing weapons or contraband, and only for the purpose of protecting institutional security after booking.

"Exceptions to the requirement of individualized suspicion are generally appropriate ***only where the privacy interests implicated by a search are minimal*** and where other safeguards are available to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field." New Jersey v. T.L.O., 469 U.S. 325, 342 (1985) (emphasis added, internal quotations and citations omitted).

The Fourth Amendment allows some post-arrest, custodial (i.e. in jail) strip searches of arrestees when there is a reasonable suspicion that the arrestee is concealing

contraband.  See Giles v. Ackerman 746 F.2d 614 (9th Cir. 1984) over-ruled on other grounds by Hodgers-Durgin v. de la Vina 199 F.3d 1037 (9th Cir. 1999).

In Fuller v. M.G. Jewelry 950 F.2d 1437 (9th Cir. 1991), the Ninth Circuit addressed case law since Bell, and concluded that **outside of the jail context**: "an arrestee may only be subjected to [a visual or physical body cavity search] if there is probable cause to believe that he has secreted the item sought in a body cavity" *and* a warrant is obtained. 950 F.2d at 1449.

The Supreme Court has remarked:  "Police conduct that would be impractical or unreasonable—or embarrassingly intrusive—on the street can more readily—and privately—be performed at the station. **For example, the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street**, but the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him, although that step would be rare."  Illinois v. Lafayette 462 U.S. 640, 645 (1983) (emphasis added).

The requirements for a strip search done in the field – i.e, in public – were set forth by the Honorable Marilyn Hall Patel for the district court in Foster v. City of Oakland, 2008 U.S. Dist. LEXIS 24610, pp. 27-28, 31-32.  Judge Patel was addressing the facial constitutionality of the Oakland Police Department's policies allowing officers to conduct strip searches in the field.  After reviewing federal case law concerning strip searches both in and out of correctional facilities, the Court determined the Fourth Amendment requirements for field strip searches:

> In sum, the court concludes that the *Fourth Amendment* requirements for the three types of strip searches performed in the field--strip search, visual body cavity search and physical body cavity search--are as follows:
>
> 1) there must be exigent circumstances;

    2) the search may only be performed on persons who have been lawfully arrested on probable cause and may not be performed on anyone for whom there is no probable cause to arrest;

    3) the search requires probable cause that is independent of the probable cause found for the arrest;

    4) the search may only be performed when there is probable cause to believe that the arrestee is in possession of weapons, drugs or dangerous contraband; and

    5) additionally, physical body cavity searches require a warrant authorizing the search and must be administered by an authorized medical professional.

Foster, 2008 U.S. Dist. LEXIS 24610, at pp. 27-28.

Further, the Court found that the Fourth Amendment requires any strip search to be done with privacy:

> Plaintiffs next argue that the OPD's 1998 Policy permits strip searches of arrestees in public, and therefore, fails to protect an arrestee's *Fourth Amendment* right to physical privacy. The "place in which [a search] is conducted" is one of the factors the courts must consider in determining the reasonableness of a search. *Bell, 441 U.S. at 559.* Plaintiffs cite to a number of cases outside the Ninth Circuit that found public strip searches to be unconstitutional for want of privacy. See, e.g., *Iskander v. Village of Forest Park, 690 F.2d 126 (7th Cir. 1982)*; *Logan v. Shealy, 660 F.2d 1007 (4th Cir. 1981)*; *Timberlake by Timberlake v. Benton, 786 F. Supp. 676 (M.D. Tenn. 1992).* The issue of whether the OPD has conducted strip searches in public, and whether OPD officials interpret the policy as permitting strip searches in public, is not before the court at this time. The court must consider only whether the 1998 Policy itself violates an arrestee's privacy interests as a matter of law. The evidence suggests that an arrestee's privacy interests are adequately protected by the policy. The Training Bulletin's fourth requirement when performing strip searches clearly states that the search must be conducted in a private area, where it cannot be observed by persons not participating in the search. 1998 Policy at 8. This requirement comports with *California Penal Code section 4030(m)* and does not justify a finding that the policy violates privacy interests as a matter of law. However, to the extent that field strip searches are inconsistent with the principles set forth above, they are violative of the *Fourth Amendment*.

Foster, 2008 U.S. Dist. LEXIS 24610, at pp. 31-32.

Similarly, the district court for the Eastern District of Washington held that officers had no qualified immunity for a strip search conducted in 2005, in the field without a warrant and exigent circumstances. Burton v. Spokane Police Dep't, 2007 U.S. Dist. LEXIS 42101.

Plaintiffs' proposed jury instructions reflect these clearly established Fourth Amendment standards.

### B.  Under California Penal Code § 4030, Plaintiffs' strip searches were unlawful for several reasons

California enacted Penal Code § 4030, addressing the requirements for legal strip searches, in 1984. Nothing in this statute limits its application to correctional facilities. By its express terms, it applies to "person[s] arrested and held in custody … prior to placement in the general jail population." § 4030(f). This statute has been cited in strip search cases outside of the correctional setting. Redding v. Safford Unified School District, 531 F.3d 1071, 1080 (9th Cir. 2008) (en banc); Foster v. City of Oakland, 2008 U.S. Dist. LEXIS 24610 at p. 19.

Subsection (c) of § 4030 defines "strip search" as "a search which requires a person to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the underclothing, breasts, buttocks, or genitalia of such person." Plaintiffs were strip searched under this definition when they each lifted their shirts exposing their undergarments, at gunpoint and in compliance with Defendants' orders.

Section 4030 strictly limits when and how a strip search may be conducted:

> No person arrested and held in custody on a misdemeanor or infraction offense, except those involving weapons, controlled substances or violence … shall be subjected to a strip search … prior to placement in the general jail population, unless a peace officer has determined there is reasonable suspicion based on specific and articulable facts to believe such person is concealing a weapon or contraband, and a strip search will result in the discovery of the weapon or contraband. No strip search …

> may be conducted without the prior written authorization of the supervising officer on duty. The authorization shall include the specific and articulable facts and circumstances upon which the reasonable suspicion determination was made by the supervisor.

§ 4030(f).

> All persons conducting or otherwise present during a strip search … shall be of the same sex as the person being searched, except for physicians or licensed medical personnel.

§ 4030(l).

> All strip … searches shall be conducted in an area of privacy so that the search cannot be observed by persons not participating in the search. Persons are considered to be participating in the search if their official duties relative to search procedure require them to be present at the time the search is conducted.

§ 4030(m).

Violation of this section is a misdemeanor.  § 4030(m).  And, the legislature created a cause of action for violation of any of these provisions: "Any person who suffers damage or harm as a result of a violation of this section may bring a civil action to recover actual damages, or one thousand dollars ($ 1,000), whichever is greater. In addition, the court may, in its discretion, award punitive damages, equitable relief as it deems necessary and proper, and costs, including reasonable attorney's fees."  § 4030(p).

Plaintiffs' Special Jury Instruction No. 4 addresses this statute.  Should Plaintiffs' prevail on this claim, they will be entitled to at least $1,000 in damages from each liable defendant, plus costs and reasonable attorneys' fees.

### 3. Plaintiffs' Civil Rights Claims under Cal. Civil Code § 52.1 Are Legally Supported, and Entitle Plaintiffs to Statutory Damages

Cal. Civil Code §52.1 (b) provides a private right of action for damages against any person who "interferes…," or "attempts to interfere by threats, intimidation, or coercion," with the exercise or enjoyment of rights under California or federal law.  The California

Supreme Court has held that section 52.1 requires **"an attempted or completed act of interference with a legal right, accompanied by a form of coercion."** Jones v. Kmart Corp., 17 Cal.4th 329, 334, 70 Cal.Rptr.2d 844 (1998).  Only these express elements are necessary to sustain a claim under §52.1; although this section was enacted, in part, in response to a tide of "hate crimes," it is not limited to "hate crimes," however one might define that term.  Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1289 (9th Cir. 2001) (§52.1 is to be interpreted broadly, and not limited to "hate crimes").

Courts in the Eastern District have explained that coercion is present when the claim arises from a law enforcement arrest.  Ohlsen v. County of San Jaoquin, 2008 U.S. Dist. LEXIS 44566 at pp. 12-13 (E.D. Cal. 2008).

In Venegas v. County of L. A., 32 Cal. 4th 820, 827; 11 Cal. Rptr. 3d 692 (2004), the California Supreme Court allowed a claim under § 52.1 for an unreasonable seizure, reaffirming that the only elements for this claim are expressly set forth in the statute.  In 2000, subsection (g) was added, which provides: "An action brought pursuant to this section is independent of any other action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law, including, but not limited to, an action, remedy, or procedure brought pursuant to Section 51.7."  The 2000 statute amending § 52.1 was intended to overrule Boccato v. City of Hermosa Beach, 29 Cal.App.4th 1797 (1994), which had added elements not included in the plain language of § 52.1.  *See,* § 52.1, Editor's Notes to Stats. 2000, Ch 98.   With this history in mind, a district court has explained that unlike § 51.7, "§ 52.1 does not by its terms require violence or threat of violence." Cole v. Doe, 387 F. Supp. 2d 1084, 1103 (N.D. Cal. 2005); Kincaid v. City of Fresno, 2008 U.S. Dist. LEXIS 38532 at p. 42 (E.D. Cal., May 12, 2008).

The remedies for a private suit under this statute are "a civil action for damages,

including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured." There are a number of damages remedies available under Section 52 [Cal. Civil Code § 52], including "A civil penalty of twenty-five thousand dollars ($25,000)," in § 52(b)(2).[3] Although § 52(b)(2) appears to limit that $25,000 penalty to actions brought under § 51.7 or § 51.9, courts have held that § 52.1(b) incorporates the civil penalty in § 52(b)(2) as a part of the "damages under Section 52" that are available for each proven violation of § 52.1.

For example, in O'Toole v. Superior Court, 140 Cal. App. 4th 488, 502 (2006), the California Court of Appeal explained: "A prevailing plaintiff [in a claim brought under the Bane Act, § 52.1] is entitled to statutory damages even if the plaintiff did not suffer any actual damages. (See Civ. Code, §§ 52.1, subd. (b), **52**, subds. (a), **(b)(2)**.)" 140 Cal. App. 4th at 502 (emphasis added). *See also,* Venegas v. County of L. A., 32 Cal. 4th 820, 850; 11 Cal. Rptr. 3d 692 (2004) (Baxter concurring) ("Under *section 52.1* as now amended, whenever any person, whether or not acting under color of law, interferes by threats, intimidation, or coercion with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, a civil action may be brought under its provisions for greatly expanded compensatory damages, substantial fines ($ 25,000), injunctive and other appropriate equitable relief, as well as attorney fees.").

---

[3] In full, § 52(b)(2) provides:
**(b)** Whoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following: …
**(2)** A civil penalty of twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right, or by the Attorney General, a district attorney, or a city attorney. An action for that penalty brought pursuant to Section 51.7 shall be commenced within three years of the alleged practice.

Cal. Civil Code § 52 (b)(2) provides for a $25,000 "civil penalty" for each violation of § 52.1.  This civil penalty is separate and apart from compensatory and punitive damages and attorneys' fees, and it is not discretionary.  The Court of Appeal explained the consequences of this provision in a case brought under § 51.7, <u>L.A. County Metro. Trans. Auth. v. Superior Court</u>, 123 Cal. App. 4th 261, 266; 20 Cal. Rptr. 3d 92, 95 (2004):

> In the Unruh Act, the Legislature expressly provided that a successful plaintiff was entitled to recover (**1**) his or her *actual* damages (Civ. Code, § 52, subd. (b)); (**2**) exemplary damages to be determined by the jury (or the court sitting without a jury), (Civ. Code, § 52, subd. (b)(1)); (**3**) a civil penalty of $ 25,000 to be awarded for a denial of the right specified in section 51.7 (Civ. Code, § 52, subd. (b)(2)); and (**4**) attorney's fees as may be determined by the court (Civ. Code, § 52, subd. (b)(3)).
>
> The first thing that one notices about these statutory provisions is that the Legislature has authorized *both* an award of punitive damages *and* an award of a civil penalty. Plainly, the Legislature regarded these as *separate* remedies. Further, the civil penalty is to be awarded to the successful plaintiff in the sum of $ 25,000. The statute leaves the court (or jury) with no discretionary choice, contrary to the other three bases of recovery. The "actual" damages that plaintiff is entitled to recover depend upon proof of their existence and amount. The "amount" of punitive damages (including the option to award zero) is left to the discretion of the trier of fact (whether court or jury) and the award of attorney's fees is left to the trial court's discretion. The civil penalty, however, *must* be awarded in the sum of $ 25,000 provided a plaintiff has proven a violation of section 51.7. **Put another way, if plaintiff establishes that he or she was a victim of the condemned discriminatory conduct, then his or her *minimum* recovery will be $25,000**.

<u>Id</u>., (italics in original).  This civil penalty is compensatory, rather than punitive, in nature, and therefore, municipalities are subject to this penalty along with individual defendants. 123 Cal. App. 4th at 270-276.

Furthermore, this penalty is to be assessed separately against each Defendant liable for a violation of civil rights.  As the Court explained in <u>L.A. County Metro. Trans. Auth.</u>, in 1991, the California legislature "deleted a provision which provided that the civil penalty be prorated among multiple offenders so as to punish each individually and to

avoid rewarding those committing hate crimes in concert with others by permitting them to pay a lower monetary penalty than offenders acting alone." 123 Cal. App. 4th at 270.

At the present time, Defendants Twardosz and the City of West Sacramento each owe Plaintiff Crankson separate $25,000 penalties stemming from their liability to her under § 52.1.

### 4.  Defendants Do not Enjoy State Law Immunity for Their Torts Rooted in Excessive Force, Unlawful Search, and False Arrest.

Defendants are not protected by state law immunities. As provided in Cal. Gov. Code § 815.2 (a):

> A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.

Similarly, except as provided by statute, a "public employee is liable for injury caused by his act or omission to the same extent as a private person." Cal. Gov. Code §820.

The Ninth Circuit already has reaffirmed the longstanding rule in California that police officers and their departments do not have immunity for excessive force, assault and battery, false arrest, and related claims. Robinson, 278 F.3d at 1016-1017. *See also*, Mary M. v. City of Los Angeles, 54 Cal. 3d 202, 215, 285 Cal. Rptr. 99 (1991) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct."); Scruggs v. Haynes, 252 Cal. App. 2d 256, 264, 60 Cal. Rptr. 355 (1967) ("California cases have consistently held that a peace officer making an arrest is liable to the person arrested for using unreasonable force."). Public employees similarly are not entitled to immunity in suits for false arrest or false imprisonment. *See,* Cal. Gov't Code § 820.4.

And, under § 815.2 (a), quoted above, a public entity is vicariously liable for the

common law torts of its employees, which would include intentional infliction of emotional distress.  <u>Munoz v. Olin</u>, 24 Cal. 3d 629, 634, 156 Cal.Rptr. 727 (1979) (police and their departments liable for both negligence and intentional tort).

                                                        Respectfully Submitted,

DATED:  January 5, 2009              HADDAD & SHERWIN

                                                        /s/  Michael J. Haddad
                                                        Michael J. Haddad
                                                        Attorney for Plaintiffs