MICHAEL J. HADDAD (State Bar No. 189114)
JULIA SHERWIN  (State Bar No. 189268)
HADDAD & SHERWIN
505 Seventeenth Street
Oakland, California  94612
Telephone: (510) 452-5500
Fax: (510) 452-5510

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARENE BEECHAM, Individually, and KARENA CRANKSON, Individually<br><br>                Plaintiff,<br><br>vs.<br><br>CITY OF WEST SACRAMENTO, a public entity, POLICE OFFICER TIMOTHY TWARDOSZ, POLICE OFFICER GEOFFREY ALBERT, POLICE OFFICER STEVE GODDEN, POLICE OFFICER ED HENSLEY, and DOES 4 through 10, Jointly and Severally,<br><br>                Defendants. | No: 2:07 -CV-01115-JAM-EFB<br><br>Hon.  John A. Mendez<br><br>**PLAINTIFFS' SUPPLEMENTAL TRIAL BRIEF RE: QUALIFIED IMMUNITY** |

1. **Obedience to Unconstitutional Policies or Training Does Not Support Defendants' Affirmative Defense of Qualified Immunity**

The Ninth Circuit has held that officers' reliance on training and training materials does not entitle them to qualified immunity when they violate the law.  In <u>CACJ v. Butts</u>, 195 F.3d 1039 (9th Cir. 1999), the Court heard defendant officers' interlocutory appeal of the district court's denial of qualified immunity in a case where, pursuant to their training and the practices of their department, officers continued "to interrogate suspects 'outside *Miranda'* despite the suspects' invocation of their right to remain silent and their requests for an attorney." 195 F.3d at 1041.  The Ninth Circuit affirmed the denial of qualified immunity, explaining:

> The fact that Los Angeles and Santa Monica may have trained their police to violate the rights of individuals does not provide any defense for these officers. Their policy contradicts the safeguards provided by *Miranda*, and, at the very least, is in direct conflict with *Cooper.*
>
> *            *            *
>
> For all of the reasons set forth in the preceding section of this opinion, a reasonable police officer should have known that this conduct was improper and violated the rights of McNally and Bey, whether or not the conduct was endorsed by training materials.

195 F.3d at 1049, 1050.  Despite department sanctioned training in unconstitutional practices, the officers were required to know the law.  <u>Id</u>.  Furthermore, the training in <u>Butts</u> apparently allowed the officers some discretion, and the officers' exercise of discretion in a manner that violated clearly established law was an additional reason for denying them qualified immunity.  195 F.3d at 1050.

Similarly in the present case, Defendants contend that although the custom and training of the West Sacramento Police Department was to initiate a High Risk stop any time vehicle "failed to yield," the primary officer could exercise judgment to call it off.  And, Defendants in this case have testified that they were at all times responsible to exercise

independent judgment as to the lawfulness of their use of force, tactics, and arrests, to ratchet down their response, and even to intervene if other officers were acting in an objectively unreasonable manner.  Nevertheless, even after Ms. Beecham was handcuffed and Officer Twardosz testified "At that point, we realized that the threat level was not has high as we maybe anticipated it to be," and even after the radio call that there was "one detained, one still in the car," and "There should be a two-year-old and a one-year-old left in the car," Officers Hensley, Albert, and Godden continued to point their guns at either Ms. Crankson or the car, and ultimately arrest Ms. Crankson.

From the beginning, Officers Hensley, Albert, and Godden testified that they responded to conduct a High Risk stop with Officer Twardosz based **solely** on the failure to yield call at "3rd and C" – only two blocks after Officer Twardosz' initial call that he was making at traffic stop at "5th and C."  They were all listening to the radio transmissions for this Code 3, High Risk stop.  The jury can find that all officers heard Officer Twardosz radio that the car was traveling at only 15 miles per hour.  All officers knew the car was not stolen.  Officer Hensley already testified that standing alone, a failure to yield is not threatening.  Officer Albert testified that a failure to yield for 3 blocks should not result in a High Risk stop.  All officers testified to their POST training and Ex. 12 (Post Learning Domain for Vehicle Pullovers), and POST training **does not** say to do a high risk stop for a simple, 3 block, 45 second failure to yield.  Under these circumstances, Defendants cannot have reasonably relied on either Officer Twardosz's failure to yield call or their general practices.  *See,* Creamer v. Porter, 754 F.2d 1311, 1320 (5th Cir. 1985) ("These officers obviously cannot be excused for their role of following the lead of Officer Porter and are properly made liable for compensatory damages awarded to Creamer.").

Adherence to a law enforcement agency's approved policies also does not give rise

to qualified immunity.  As the D.C. Circuit wrote in <u>Hobson v. Wilson</u>, 737 F.2d 1 (D.C. Cir.

1984) (denying rehearing):

> Second, the FBI defendants argue for the first time that compliance
> with an agency's approved policy should be deemed one of the
> "extraordinary circumstances" (as yet undefined) giving rise to immunity
> under *Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S. Ct. 2727, 73 L. Ed.
> 2d 396 (1982)*. In its most extreme form, this argument amounts to the
> contention that obedience to higher authority should excuse disobedience to
> law, no matter how central the law is to the preservation of citizens' rights.
> We have no hesitation in rejecting this new argument.

737 F.2d 1, 67.

In <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002), the Supreme Court held any

requirement that facts of previous cases be "materially similar" to the case at issue is a

"rigid gloss on the qualified immunity standard" that is "not consistent with our cases."  The

"salient question" is whether the state of the law at the time of the events in question gave

Defendants "fair warning" that their alleged conduct was unconstitutional.  <u>Id</u>.

By June 29, 2006, after the 2002 *en banc* decision in <u>Robinson v. Solano County</u>,

278 F.3d 1007, 1014-1015 (9th Cir. 2002) (*en banc*) (pointing a gun at a person "can be a

violation of the Fourth Amendment, especially where the individual poses no particular

danger"), and the 1996 decision in <u>Washington v. Lambert</u>, 98 F.3d 1181, 1187 (9th Cir.

1996) ("Under ordinary circumstances, when the police have only reasonable suspicion to

make an investigatory stop, drawing weapons and using handcuffs and other restraints will

violate the Fourth Amendment"), Defendants clearly had fair notice that holding non-

threatening women at gunpoint for several minutes under these circumstances would

constitute excessive force.  278 F.3d at 1014-1015.  In addition, the Ninth Circuit remarked

in <u>Tekle v. United States</u>, 511 F.3d 839, 847 (9th Cir. 2006), that "We have held since 1984

that pointing a gun at a suspect's head can constitute excessive force in this circuit."

Moreover, the *en banc* Courts in both <u>Robinson</u> and <u>Motley v. Parks</u>, 432 F.3d

1072, 1088 (9th Cir. 2005) (*en banc*), referred to pointing a gun as a "use of force." [1]

Whether pointing a gun is referred to as a use of force or a show of force misses the point

that the Ninth Circuit has repeatedly held pointing a gun at a person can constitute

excessive force.  The WSPD should have known that law and trained its officers

accordingly.  Regardless of their WSPD training, Defendants were required to know this

clearly established law.

Subjective or potential threats are not sufficient to justify the force used here.  For

example, in Winterrowd v. Washington, 480 F.3d 1181, 1185 (9th Cir. 2007), the Court

discounted officers' "generalized concerns" that they claimed justified their use of force

against a driver in a traffic stop.  In Winterrowd, officers allegedly painfully twisted the

plaintiff's arm behind his back after being informed the plaintiff had a shoulder injury.  The

officers came up with several purported reasons why they thought Winterrowd posed a

possible threat to justify their use of force, including that he refused to register his car, that

he carried 20-25 pens and pencils on his person that could have been used as weapons,

that he had a "belligerent attitude" and deliberately refused to follow vehicle licensing laws,

---

[1] Concluding that the pointing of guns constituted a use of force, the Robinson Court then analyzed that use of force under relevant Fourth Amendment factors.  "Consideration of those factors does not support the ***use of force*** in this case." 278 F. 3d at 1014 (emphasis added).  A previous threat posed by the plaintiff did not justify holding him at gunpoint later:  "The only circumstances in this case favoring the ***use of force*** was the fact that plaintiff had earlier been armed with a shotgun that he used to shoot the neighbor's dogs.  We conclude that Robinson's earlier use of a weapon, that he clearly no longer carried, is insufficient to justify the intrusion on Robinson's personal security." Id. (emphasis added).

The Motley Court explained that "An officer's show of force is subject to *Fourth Amendment* reasonableness requirements even where no actual force is applied." Motley v. Parks, 432 F.3d 1072, 1088 (9th Cir. 2005) (*en banc*).  Following Robinson, the Motley Court held that the plaintiff had stated a Fourth Amendment claim for excessive force where it was alleged an officer, executing a dangerous raid and search of a gang member's house, kept his gun pointed at an infant.  432 F.3d at 1089.  Nevertheless, like the Robinson *en banc* Court, the Motley Court described the officer's pointing his gun at the plaintiff as a use of force. Id, ("In this case, as in McDonald [v. Haskins, 966 F.2d 292 (7th Cir. 1992)], none of the factors justifying the **use of force** toward Juan exists.") (emphasis added).

that he had a gun in his car that officers did not know about at the time, and that he had

expressed a "hostile" attitude toward law enforcement in the past.  480 F.3d at 1184-1185.

The Court of Appeals dispensed with each of those purported threats, explaining at most

the officers had identified a potential or possible threat and not the immediate threat

required for a use of force.  480 F.3d at 1184-1186.  The Court explained:

> Such generalized concerns, standing alone, cannot justify the use of force.
> *See Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001)* ("[A] simple
> statement by an officer that he fears for his safety or the safety of others is
> not enough; there must be objective factors to justify such a concern.").

480 F.3d at 1185.

Defendants do not have qualified immunity for Plaintiffs' excessive force claims.

Similarly, "that a police officer may arrest a suspect only if he has probable cause to

believe a crime has been committed is a bedrock *Fourth Amendment* precept."  Beier v.

City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004).  Defendant Twardosz knew that he

had arrested Ms. Beecham by handcuffing her and issuing her a misdemeanor citation.

Yet the misdemeanor citation he issued her required her to have *intentionally* evaded his

lawful attempts to pull her over, and when he issued her the ticket, he testified he

understood that "she just failed to understand that [he] wanted her to pull over in the

manner that [he] did."  A jury can find that Officer Twardosz violated clearly established law

when he arrested Ms. Beecham with any belief that she had intentionally evaded him.

Any reasonable officer would have known under these circumstances that both

women had been arrested.  *See,* Washington, 98 F.3d at 1185-1192 (plaintiffs were

arrested as a matter of law where officers ordered them out of car at gunpoint, handcuffed

and frisked them, and placed them in separate police cars for between 5 and 25 minutes).

Defendant Hensley admits he knew of no crime that the passenger, Ms. Crankson

had committed.  Yet, Officer Hensley is required to know the law, including as explained in

Rohde v. City of Roseberg, 137 F.3d 1142 (9th Cir. 1998).  In Rohde, the Ninth Circuit held that where police arrested both the driver and the passenger of a car suspected of being stolen, the arrest of the passenger was unlawful, because "merely" being the passenger did not give the police probable cause to believe she had committed any crime.  137 F.3d at 1144.

Defendants Twardosz and Hensley do not have qualified immunity for these false arrests in violation of this "bedrock" Fourth Amendment principle.  *See,* Price v. Kramer, 200 F.3d 1237, 1245-48 (9th Cir. 2000) ("Officers are not entitled to qualified immunity for stopping a vehicle without probable cause or reasonable suspicion, especially when the stop includes detention and interrogation at gunpoint."); Morgan v. Woessner, 997 F.2d 1244, 1259-1260 (9th Cir. 1993) (pre-Saucier racial profiling case involving Hall of Fame baseball player Joe Morgan); Stevens v. Rose, 298 F.3d 880, 884-885 (9th Cir. 2002) (no qualified immunity for arrest without probable cause); Wall v. County of Orange, 364 F.3d 1111 (9th Cir. 2004) (same).

Finally, Defendants Albert and Godden do not have qualified immunity for their own independent actions that violated Plaintiffs' rights, such as pointing their guns at Plaintiffs without any actual, immediate, objective threat.  And, Defendants Albert and Godden do not have qualified immunity when they were also integral participants in this High Risk stop.  As the Ninth Circuit explained recently in Blankenhorn v. City of Orange, 485 F.3d 463, 481, n. 12 (9th Cir. 2007):

> An officer's liability under *section 1983* is predicated on his "integral participation" in the alleged violation. *Chuman v. Wright, 76 F.3d 292, 294-95 (9th Cir. 1996).* "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd, 374 F.3d at 780* [*Boyd v. Benton County, 374 F.3d 773 (9th Cir. 2004)*]. But it does require some fundamental involvement in the conduct that allegedly caused the violation. *See id.* (**holding that every officer who provided *armed backup* for another officer who unconstitutionally**

**deployed a flash-bang device to gain entry to a suspect's home could be held liable for that use of excessive force because "every officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flashbang was to be deployed"**).

Id, (emphasis added).  In another opinion that explains liability for "integral participation," Ochoa v. City of Buena Park, 2008 U.S. Dist. LEXIS 40996 (C.D. Cal. 2008), the district court followed Boyd and Blankenhorn, and noted "[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation."  Id., at p. 18.  Nevertheless, the actions of Officers Albert and Godden **did** rise to the level of a constitutional violation.

No officer in this case is entitled to qualified immunity.

Respectfully Submitted,

DATED:  March 31, 2009          HADDAD & SHERWIN

/s/  Michael J. Haddad
Michael J. Haddad
Attorney for Plaintiffs